JOHN B. BULGOZDY, Cal. Bar No. 219897
Email: bulgozdyj@sec.gov
GARY Y. LEUNG, *L.R. 83-2.4.1 leave to practice granted*
Email: leungg@sec.gov
JANET E. MOSER, Cal. Bar No. 199171
Email: moserj@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Lorraine B. Echavarria, Associate Regional Director
John W. Berry, Regional Trial Counsel
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
Telephone:  (323) 965-3998
Facsimile:  (323) 965-3908

**FILED**
CLERK, U.S. DISTRICT COURT

DEC 1 4 2012

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. **CV12-10692** JFW(PZx) |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| ALETHEIA RESEARCH AND MANAGEMENT, INC., and PETER J. EICHLER, JR., | |
| Defendants. | |

Plaintiff Securities and Exchange Commission ("Commission") alleges the following against Defendants Aletheia Research and Management, Inc. ("Aletheia") and Peter J. Eichler, Jr. ("Eichler"):

### SUMMARY

1.      This case is about a "cherry-picking" scheme by an investment adviser and the adviser's CEO. The investment adviser, Defendant Aletheia, which recently filed for bankruptcy, provided investment advisory services through several investment strategy products. Separate and apart from those strategy products, Defendant Eichler, the chairman and CEO of Aletheia, traded options for a number of Aletheia-managed accounts. It is this option trading that is at the heart of the Defendants' cherry-picking scheme.

2.      Like many investment advisers, the Defendants generally did not allocate a specific option trade to any one account until after the trade was executed. Allocations of options trades were made hours and sometimes days after execution. This delay gave the Defendants the opportunity to "cherry-pick" – that is, allocate the winning trades to some accounts, and allocate the losing trades to other accounts. And that is exactly what the Defendants did. They allocated the winning trades to certain favored accounts, including accounts personally held by Eichler as well as other select employees and clients, and allocated the losing trades to two disfavored hedge funds.

3.      By engaging in this cherry-picking scheme, the Defendants violated the fiduciary duties they owe to the disfavored hedge funds and the Aletheia advisory clients invested in those funds, and the Defendants further violated the antifraud provisions of the federal securities laws. In addition, Aletheia failed to implement policies, procedures, or a code of ethics that reasonably could have prevented the scheme. Over the course of approximately 27 months from mid-August 2009 through November 2011, the Defendants' cherry-picking scheme

1   allowed the favored accounts to obtain approximately $4.14 million in profit

2   (including roughly $2 million in profit to Eichler's personal accounts), while the

3   two disfavored hedge funds sustained trading losses of approximately $4.4 million.

4        4.      In addition to engaging in this cherry-picking scheme, Aletheia

5   breached its fiduciary duties and violated the federal securities laws in a second

6   way.  Federal securities laws require an investment adviser to fully and promptly

7   disclose any financial condition that is reasonably likely to impair the investment

8   adviser's ability to meet contractual commitments to its advisory clients.  No later

9   than July 2012, Aletheia was in a precarious financial condition.  According to

10  Eichler himself, long-running lawsuits had "decimated" Aletheia's business.  The

11  state of California had filed a $2,053,470 tax lien against Aletheia for unpaid taxes

12  and penalties.  And on October 1, 2012, California suspended Aletheia's corporate

13  status for failing to pay this enormous tax bill.  Once suspended, Aletheia could not

14  legally exercise any of its corporate powers, rights and privileges in the state of

15  California.  In breach of its fiduciary duties and federal law, however, Aletheia did

16  not disclose its precarious financial condition to its clients until November 9, 2012,

17  on the very eve of its bankruptcy filing.

18       5.      By engaging in this conduct, the Defendants violated the antifraud

19  provisions of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange

20  Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5(a) &

21  (c), and the antifraud provisions of Sections 206(1), 206(2) and 206(4) of the

22  Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §§ 80b-6(1), (2) and

23  (4), and Rule 206(4)-8(a) thereunder, 17 C.F.R. § 275.206(4)-8(a); and Aletheia

24  violated the reporting provisions of Sections 204 and 207 of the Advisers Act, 15

25  U.S.C. §§ 80b-4 and 80b-7, and Rule 204-1(a)(2) thereunder, 17 C.F.R. § 275.204-

26  1(a)(2), the compliance procedures and practices provision of Section 206(4) of the

27  Advisers Act, 15 U.S.C. § 80b-6(4), and Rule 206(4)-7(a) thereunder, 17 C.F.R. §

28

1   275.206(4)-7, and the ethics code requirement of Section 204A of the Advisers

2   Act, 15 U.S.C. § 80b-4A, and Rule 204A-1(a) thereunder, 17 C.F.R. § 204A-1(a).

3   The Commission seeks a permanent injunction prohibiting future violations,

4   disgorgement of ill-gotten gains together with prejudgment interest thereon, and

5   the imposition of civil penalties.

6                           **JURISDICTION AND VENUE**

7          6.     This Court has jurisdiction over this action pursuant to Sections 21(d),

8   21(e), and 27(a) of the Exchange Act, 15 U.S.C. §§ 78u(d)(1), 78u(d)(3), 78u(e) &

9   78aa(a), and Sections 209(d), 209(e), and 214(a) of the Advisers Act, 15 U.S.C. §§

10  80b-9(d), 80b-9(e) & 80b-14(a).

11         7.     Venue is proper in this judicial district under Section 27(a) of the

12  Exchange Act, 15 U.S.C. § 78aa(a), and Section 214(a) of the Advisers Act, 15

13  U.S.C. § 80b-14(a), because Eichler resides in and transacts business in this

14  district, Aletheia transacts business in this district, and certain of the transactions,

15  practices, and courses of business constituting violations of the federal securities

16  laws occurred within this district.

17         8.     Defendants have, directly or indirectly, made use of the means or

18  instrumentalities of interstate commerce, or of the mails, in connection with the

19  transactions, acts, practices and courses of business alleged herein.

20                              **DEFENDANTS**

21         9.     Aletheia was organized as a California corporation in 1997, and its

22  principal place of business is in Santa Monica, California.  Since 1998, Aletheia

23  has been registered with the Commission as an investment adviser under Section

24  203 of the Advisers Act, 15 U.S.C. § 80b-3.  Aletheia's corporate status was

25  suspended by the State of California on October 1, 2012 for non-payment of taxes.

26  On November 11, 2012, Aletheia filed for Chapter 11 bankruptcy in the U.S.

27  Bankruptcy Court for the Central District of California.

28

1        10.    Eichler, age 54, resides in Pacific Palisades, California.  Eichler is

2   Aletheia's founder, and was at all relevant times Aletheia's majority owner,

3   chairman, chief executive officer ("CEO") and chief investment officer ("CIO").

4   During the relevant period, Eichler – as Aletheia's CEO and CIO – had full

5   discretionary authority over all Aletheia client accounts and was solely responsible

6   for all investment decisions, including the fraudulent cherry-picking of options

7   alleged herein.

## FACTS

### A.    Background

#### 1.    Aletheia's Investment Advisory Business

11        11.    At its peak, Aletheia had more than $10 billion in assets under

12   management.  Aletheia's clients were primarily institutional investors, pension

13   funds, endowments, foundations, and high net worth individuals.

14        12.    Aletheia provided investment advisory services in various investment

15   strategies, including growth, value, international growth, income, international

16   income, balanced, and cash management.  Aletheia marketed these managed

17   investment products as the Aletheia Growth, Aletheia Value, Aletheia International

18   Growth, Aletheia Intermediate Cash Management, Aletheia Income, Aletheia

19   Balanced, and Aletheia International Income investment portfolios.

20        13.    Aletheia Securities, Inc. ("ASI") acted as the introducing broker for

21   the options trading described herein.  ASI is a registered introducing broker-dealer

22   that is wholly-owned by Aletheia.  ASI cleared its trades through National

23   Financial Services, LLC ("NFS"), a division of Fidelity Investments.

#### 2.    The Aletheia Investment Accounts at Issue

25        14.    In addition to the investment portfolio strategies described above,

26   Aletheia managed accounts for certain of its customers, its officers and employees,

27   and two hedge funds.  From at least mid-August 2009 through November 2011

28

1 (the "relevant period"), Eichler used Aletheia's discretionary authority over these

2 accounts and funds to engage in option trading on their behalf.

3      15.    Specifically, Aletheia managed what were called "custom accounts"

4 for certain Aletheia clients who were not entirely invested in Aletheia's strategy

5 investment products. During the relevant period, these clients held 24 Aletheia

6 custom accounts which also traded in options (the "Favored Custom Accounts").

7      16.    Aletheia also managed accounts that were held by Aletheia, its

8 corporate officers (including Eichler), its employees, or family members of

9 Aletheia's employees. During the relevant period, 24 of these Aletheia-related

10 accounts traded in options (the "Favored Aletheia-Related Accounts"). The

11 Favored Aletheia-Related Accounts included Eichler's personal accounts (the

12 "Eichler Accounts") and an account in which Aletheia made proprietary trades on

13 its own behalf (the "Aletheia Proprietary Account").

14      17.    In addition, Aletheia managed two privately-offered funds, Aletheia

15 Insider Index, L.P. (the "Insider I Fund") and Aletheia Insider Index II, L.P. (the

16 "Insider II Fund") (collectively, the "Disfavored Hedge Funds"). Aletheia only

17 offered the Insider I Fund and the Insider II Fund to Aletheia advisory clients.

18 Investors in the Disfavored Hedge Funds were primarily high net worth

19 individuals. Like the Favored Custom Accounts and the Favored Aletheia-Related

20 Accounts, the Disfavored Hedge Funds held an account which traded in options

21 during the relevant period (the "Disfavored Hedge Funds Account").[1]

22      18.    As their general partner, Aletheia had the sole right to conduct the

23 operations of the Disfavored Hedge Funds. During the relevant period, Aletheia

24 was the investment manager for the Disfavored Hedge Funds.

25

26 [1] Appendix A, attached hereto and incorporated herein, is a chart listing the last

27 four digits of the account numbers for the Favored Custom Accounts, Favored

28 Aletheia-Related Accounts, and Disfavored Hedge Funds Account.

19.     At the end of 2008, shortly before the start of the fraudulent options trading alleged herein, the Insider I Fund had net assets of $35.9 million and the Insider II Fund had net assets of $75.6 million.  By July 1, 2012, due to subsequent investor redemptions and trading losses – including those sustained as a result of the cherry-picking scheme alleged herein – the Insider Fund I had only $1.3 million in net assets and the Insider II Fund had only $1.4 million in assets.

20.     During the relevant period, the Favored Custom Accounts, Favored Aletheia-Related Accounts and the Disfavored Hedge Funds Account (collectively, the "Option Trading Accounts") were all managed by Aletheia.  Eichler, as Aletheia's CEO and CIO, had full discretionary authority over all Aletheia client accounts – including the Option Trading Accounts.  He was also solely responsible for all of the investment decisions made for these accounts throughout the relevant period.

**B.     The Defendants' Cherry-Picking Scheme**

21.     From at least mid-August 2009 through November 2011, Eichler used Aletheia's discretionary authority over the Option Trading Accounts to place approximately 4,791 options trades for an aggregate investment of $238.9 million on behalf of these accounts.

22.     Eichler made all decisions regarding the option trading in the Option Trading Accounts and all decisions concerning which accounts these option trades would be allocated to.  The trades were not allocated to any account until after each trade was executed.  Because the majority of those trades were allocated more than one hour after trade execution, or allocated after the options position had closed (when profit or loss on the trade was certain), Eichler was routinely able to cherry-pick winners and losers for the benefit of the Favored Aletheia-Related Accounts and the Favored Custom Accounts, and at the expense of the Disfavored Hedge Funds Account.

### 1.    Aletheia's Trading Procedures

23.    An options trade is more susceptible to cherry-picking the later it is allocated because over time, post-execution movements in price will enable an adviser to steer profitable trades to favored accounts, and less profitable or unprofitable trades to disfavored accounts.  This opportunity is most prevalent when the trades are allocated after the options position is closed, when the profit or loss on the trade is known with certainty.  By cherry-picking on the basis of this information, Eichler could reduce or entirely eliminate investment risk for favored accounts, including his own.

24.    The Defendants engaged in their cherry-picking scheme by allocating options trades during the relevant period in the following manner.  First, Eichler orally communicated an instruction to buy or sell an option to a trading assistant.  The trading assistant then filled out a hand-written order ticket as instructed by Eichler.  On the order ticket, the trading assistant entered information for the security being traded, the quantity purchased, and in some cases, a price limit.  Eichler did not provide allocation information at the time he instructed the trading assistant to place an order.  Consequently, the trading assistant left blank the portion of the order ticket corresponding to the name and/or account number of the client engaging in the ordered trade.

25.    Next, the trading assistant placed the order with Aletheia's clearing broker, NFS, through its trading system.  Information on the security being traded, the quantity purchased, and if applicable, the requested price limit, was sufficient to execute an options order with NFS.

26.    Therefore, by the time the trade was placed and executed, it had not been allocated to any specific Option Trading Account.  Instead, from mid-August 2009 to August 15, 2010, Aletheia placed option trades either through an allocation account held by the Disfavored Hedge Funds, or through a general allocation

1    account held by ASI.  In the event that Eichler wanted to move an option trade to
2    the Disfavored Hedge Funds Account, Aletheia would cancel the initial trade from
3    the general ASI allocation account and re-place the trade through the Disfavored
4    Hedge Funds' allocation account.  In the event that Eichler wanted to move an
5    option trade away from the Disfavored Hedge Funds Account, Aletheia would
6    cancel the initial trade from the Disfavored Hedge Funds' allocation account and
7    re-place the trade through the general ASI allocation account.  From August 16,
8    2010 through November 2011, however, Eichler had greater flexibility to allocate
9    option trades because all option trades executed during that time period were
10   placed only through the ASI allocation account.  From there, Eichler could directly
11   allocate an option trade to whichever Option Trading Account he wanted.

12        27.    After the trade was executed, Eichler spoke to the trading assistant
13   and told her at that time which account(s) to allocate a given options trade to.  Only
14   then did the trading assistant add allocation information to the order ticket, and
15   allocate the options trade per Eichler's instruction in NFS's trading system.  Prior
16   to this point, for the vast majority of the option trades in question, the trading
17   assistant had no knowledge of which Aletheia clients were trading in the options
18   order she had earlier executed through NFS.

19        28.    In perpetrating his cherry-picking scheme, the Defendants late-
20   allocated the majority of the approximately 4,791 options trades he placed from
21   mid-August 2009 through November 2011.  Only an approximate 38% of those
22   options orders were allocated to Option Trading Accounts within an hour of trade
23   execution.  The remaining 62% were either allocated more than an hour after
24   execution, or allocated after the options position was completely closed and actual
25   profit or loss on the trade was certain.

26

27

28

1

        2.     The Impact of the Cherry-Picking Scheme

     29.    Through the course of thousands of options trades from mid-August 2009 through November 2011, the overall impact of the Defendants' cherry-picking scheme was that the Favored Aletheia-Related Accounts and Favored Custom Accounts received a disproportionate share of the late-allocated profitable trades, and the Disfavored Hedge Funds Account received a disproportionate share of the unprofitable late-allocated trades.

     30.    For the options trades allocated within an hour of execution (when the ability to cherry-pick is lower), the Favored Aletheia-Related Accounts, Favored Custom Accounts and Disfavored Hedge Funds Account earned similar investment results:  in their aggregate, each of the three groups of Option Trading Accounts sustained trading losses.

     31.    In contrast, the investment returns on options trades that were allocated more than an hour after execution – when the opportunity to cherry-pick was greater – reveal a stark difference in performance at the time of allocation between the Favored Aletheia-Related Accounts and Favored Custom Accounts, on the one hand, and the Disfavored Hedge Funds Account, on the other.  In the relevant period, about 2,493 of the 4,791 option trades were allocated more than one hour after execution.  As the chart below shows, because of the cherry-picking scheme, the Favored Aletheia-Related Accounts and Favored Custom Accounts earned positive returns on these late-allocated trades, while the Disfavored Hedge Funds Account earned negative returns:

| TRADES ALLOCATED MORE THAN AN HOUR AFTER EXECUTION | |
|---|---|
| Account Type | Return |
| Favored Custom Accounts | 2.7% |
| Favored Aletheia-Related Accounts | 5.2% |
| Aletheia Proprietary Account | 3.4% |
| Eichler Accounts | 5.6% |
| Disfavored Hedge Funds Account | -6.5% |

32.    Similarly, because of the cherry-picking scheme, the Defendants allocated more of the profitable late-allocated trades to the Favored Aletheia-Related Accounts and Favored Custom Accounts, and fewer of these profitable trades to the Disfavored Hedge Funds Account:

| TRADES ALLOCATED MORE THAN AN HOUR AFTER EXECUTION | |
|---|---|
| Account Type | % of Allocations That Were Profitable |
| Favored Custom Accounts | 55.0% |
| Favored Aletheia-Related Accounts | 53.7% |
| Aletheia Proprietary Account | 54.3% |
| Eichler Accounts | 51.3% |
| Disfavored Hedge Funds Account | 30.8% |

[2] Options trades during the relevant period were allocated by the Defendants either while the position remained open or after the position had been closed. For open trades, the described investment returns are calculated using the mid-point between the closing best bid and best ask prices on the day of allocation. For closed trades, actual trade prices were used.

10

33.     The difference in returns and percentage of profitable allocations is even more pronounced for the trades allocated only after the options position was closed out, which enabled Eichler to know with certainty at the time of allocation whether the trade was profitable and to what degree.  In the relevant period, about 463 of the 4,791 option trades were allocated after the options position was closed. The cherry-picking scheme caused the Favored Aletheia-Related Accounts and Favored Custom Accounts to earn positive returns on these "perfect information" trades, while the Disfavored Hedge Funds Account earned negative returns:

| "PERFECT INFORMATION" TRADES | |
| --- | --- |
| Account Type | Return |
| Favored Custom Accounts | 11.0% |
| Favored Aletheia-Related Accounts | 17.2% |
| Aletheia Proprietary Account | 12.9% |
| Eichler Accounts | 19.1% |
| Disfavored Hedge Funds Account | -1.7% |

34.     Likewise, because of the cherry-picking scheme, more of the profitable, "perfect information" trades were allocated to the Favored Aletheia-Related Accounts and Favored Custom Accounts, while a lesser amount of these profitable, "perfect information" trades were allocated to the Disfavored Hedge Funds Account:

11

| "PERFECT INFORMATION" TRADES | |
| --- | --- |
| Account Type | % of Allocations That Were Profitable |
| Favored Custom Accounts | 98.0% |
| Favored Aletheia-Related Accounts | 99.0% |
| Aletheia Proprietary Account | 100% |
| Eichler Accounts | 98.3% |
| Disfavored Hedge Funds Account | 31.7% |

35.    Under the cherry-picking scheme, the Defendants personally profited from these disproportionate allocations.

36.    For example, with respect to "perfect information" trades allocated only after the options position was closed, Eichler's accounts (which fell within the Favored Aletheia-Related Accounts) enjoyed extraordinary trading success. During the relevant period, the Defendants allocated 120 of these trades to Eichler, and 118 (or 98%) were profitable. Eichler profited from virtually all of his "perfect information" trades, and was only able to do so through the cherry-picking scheme. On these trades, Eichler realized approximate trading profits of $945,000 and a 19.1% return.

37.    With respect to "perfect information" trades allocated only after the options position was closed, the Aletheia Proprietary Account also enjoyed extraordinary trading success. From mid-August 2009 to the end of November 2011, the Defendants allocated 41 of these trades to the Aletheia Proprietary Account, and all 41 of them (100%) were profitable. On these "perfect information" trades, Aletheia realized approximate trading profits of $243,000 and

1  an approximate 13.04% return.

2       38.    By contrast, of the 60 "perfect information" trades allocated to the

3  Disfavored Hedge Funds Account during the relevant period, only 19 (or 31.67%)

4  were profitable.  On a net basis, the Disfavored Hedge Funds Account did not even

5  profit on these trades, and instead *lost* approximately $69,000 for a negative 1.73%

6  return.

7       39.    Between mid-August 2009 and the end of November 2011, the

8  Favored Aletheia-Related Accounts and Favored Custom Accounts obtained about

9  $4.14 million in profit on option trades allocated more than one hour after

10  execution, or allocated after the position was closed out (including roughly $2

11  million in trading profits to Eichler himself), while the Disfavored Hedge Funds

12  *lost* $4.4 million on late-allocated or "perfect information" trades.

13       3.    <u>Examples of the Cherry-Picking Scheme</u>

14       40.    From at least mid-August 2009 through November 2011, the

15  Defendants disproportionately allocated profitable trades to the Favored Aletheia-

16  Related Accounts and Favored Custom Accounts, and less profitable trades to the

17  Disfavored Hedge Funds Account.  Through the late allocation procedures

18  described above, the Defendants accomplished this disproportionate allocation in

19  various ways.

20       41.    Pursuant to the cherry-picking scheme, Eichler regularly allocated

21  trades for which he had perfect information – *i.e.*, only after the options position

22  was completely closed and profit was fully known – to the Eichler Accounts.  For

23  these trades, he did not allocate what he knew to be a profitable trade fairly and

24  equitably among the investment accounts under his management.  For example:

25       A.    On February 1, 2010, from 10:20 a.m. to 10:21 a.m., Eichler bought

26             150 Amazon options through the ASI allocation account, at a price of

27             $11.45 per share (each option represents the right to buy or sell 100

28

1    shares).  By 11:47 a.m., the option price had risen to $15.20 per share.

2    At that time, the ASI allocation account sold 150 Amazon options at

3    $15.20 per share.  Then, at 11:49 – only after the Amazon position

4    was profitably closed out and with this perfect information in hand –

5    Eichler allocated every one of the Amazon options trades to his

6    personal trading account.  Because of this late allocation, Eichler

7    personally profited approximately $56,212.43.

8    B.    On February 23, 2011, at 12:20 p.m., Eichler bought 125 Fluor

9          options through the ASI allocation account, at prices of $5.00 per

10         share (16 options) and $4.95 per share (109 options).  By 2:11 p.m.,

11         the option price had risen to $7.70 per share.  At 2:11 p.m., the ASI

12         allocation account sold the 125 Fluor options at prices of $7.70 per

13         share (99 options) and $7.96 per share (26 options).  Then, at 4:10

14         p.m. – only after the Fluor position was profitably closed out and with

15         this perfect information in hand – Eichler allocated every one of the

16         Fluor options trades to his personal trading account.  Because of this

17         late allocation, Eichler personally profited approximately $34,931.16.

18   42.   Pursuant to the cherry-picking scheme, Eichler also allocated

19   profitable "perfect information" trades to his own account and an account held by

20   an Aletheia trading assistant.  For these trades, he did not allocate what he knew to

21   be a profitable trade fairly and equitably among the investment accounts under his

22   management.  For example:

23   A.    On December 9, 2010, from 1:44 p.m. to 1:52 p.m., Eichler bought

24         500 AIG options through the ASI allocation account, at prices ranging

25         between $0.86 and $1.02 per share.  From 2:28 p.m. to 3:15, Eichler

26         closed out the position, selling the 500 AIG options at prices ranging

27         between $1.41 and $2.00 per share.  Then, at 3:57 p.m. – only after

28

14

1     the AIG position was profitably closed out and with this perfect

2     information in hand – Eichler allocated 425 of the AIG options trades

3     to his personal trading account and the remaining 75 AIG options

4     trades to the trading account of an Aletheia trading assistant.  Because

5     of this late allocation, Eichler personally profited approximately

6     $25,879.06 and the Aletheia trading assistant profited approximately

7     $4,361.93.

8     B.     On December 10, 2010, at 12:11 p.m., Eichler bought 225 Barrick

9     Gold options through the ASI allocation account, at a price of $3.10

10     per share.  From 3:57 p.m. to 3:58 p.m., Eichler closed out the

11     position, selling the 225 Barrick Gold options at $3.30 per share.

12     Then, at 4:01 p.m. – only after the Barrick Gold position was

13     profitably closed out and with this perfect information in hand –

14     Eichler allocated 150 of the Barrick Gold options trades to his

15     personal trading account and the remaining 75 Barrick Gold options

16     trades to the trading account of an Aletheia trading assistant.  Because

17     of this late allocation, Eichler personally profited approximately

18     $2,960.50 and the Aletheia trading assistant profited approximately

19     $1,462.96.

20     43.     Pursuant to the cherry-picking scheme, Eichler regularly allocated

21  unprofitable perfect information trades – *i.e.*, only after the options position was

22  completely closed at a realized loss – to the Disfavored Hedge Funds Account.  For

23  these trades, he did not allocate what he knew to be an unprofitable trade fairly and

24  equitably among the investment accounts under his management.  For example:

25     A.     On December 31, 2010, at 11:55 a.m., Eichler bought 175 Newport

26     Mining options through the ASI allocation account, at a price of $6.85

27     per share.  These options dropped in price over the next several hours

28

1    and at 3:53 p.m., Eichler sold them at a loss for a price of $6.40 per
2    share.  Then, at 3:54 p.m. – after the Newport Mining position was
3    closed out for a recognized day trading loss of $7,875 – Eichler
4    allocated every one of these losing trades to the Disfavored Hedge
5    Funds Account.

6    B.   On January 3, 2011, at 12:11 p.m. through 12:13 p.m., Eichler bought
7         250 Barrick Gold options at a price of $3.20 to $3.21 per share.  These
8         options dropped in price over the next several hours and at 3:56 p.m.,
9         Eichler sold them at a loss for a price of $2.98 per share.  Then, at
10        4:02 p.m. – after the Barrick Gold position was closed out for a
11        recognized day trading loss of $5,645 – Eichler allocated every one of
12        these losing trades to the Disfavored Hedge Funds Account.

13   44.   Pursuant to the cherry-picking scheme, Eichler regularly allocated
14   open trades that had, since execution, become unprofitable to the Disfavored
15   Hedge Funds Account.  He did not allocate what he knew to be an already
16   unprofitable open trade fairly and equitably among the investment accounts under
17   his management.  For example:

18   A.   On September 16, 2009, from 9:37 a.m. to 2:19 p.m., Eichler bought
19        550 Amazon short-term options, set to expire in 3 days, through the
20        ASI allocation account.  Eichler's first trade at 9:37 a.m. was at $3.55
21        per share, and as he continued to buy options from then until 2:19
22        p.m., he executed trades at $2.07 per share, $2.06 per share, $1.33 per
23        share, $1.32 per share, and $1.30 per share.  The midpoint between
24        the best bid and best ask at the end of the trading day on September
25        16, 2009 was $1.025 per share.  At 5:25 p.m., after market close,
26        however, Eichler allocated 100 of these option trades to the
27        Disfavored Hedge Funds' allocation account at the highest executed

28                                    16

price of $3.55 per share, and another 150 of these option trades to the Disfavored Hedge Funds' allocation account at a price of $2.07 per share. At 6:37 p.m., the remaining 300 Amazon options were all allocated to favored custom accounts and Aletheia-Related accounts at the lower price of $1.33 per share. Because more unprofitable, higher-priced option trades were allocated to the Disfavored Hedge Funds Account, the Disfavored Hedge Funds sustained a substantially larger unrealized loss at the end of the allocation day of $40,968.50, or negative 61.52%.

B.   On May 19, 2011, at 9:30 a.m., Eichler bought 200 Deere & Co. short-term options, set to expire in 2 days, through the ASI allocation account. These trades were executed at prices ranging from $2.61 per share to $2.33 per share. The midpoint between the best bid and best ask at the end of the trading day on May 19, 2011 was $1.215 per share. At 3:56 p.m., Eichler allocated all 200 Deere & Co. options to the Disfavored Hedge Account, for an unrealized loss at the end of the allocation day of $24,388.00, or -50.09%.

4.   Defendants' Breach of Fiduciary Duty and Fraudulent Scheme

45.   The Defendants owed a fiduciary duty to Aletheia's advisory clients. As the investment adviser and its CEO, Aletheia and Eichler, respectively, owed all of the advisory clients invested in each of the Option Trading Accounts a fiduciary duty to exercise the utmost good faith, to disclose all material facts, and to employ reasonable care to avoid misleading them.

46.   The Defendants each breached their respective duty through the cherry-picking scheme they conducted during the relevant period. The Defendants' practice of disproportionately allocating options trades to favored accounts rather than the Disfavored Hedge Funds Account, based on their ability to

1  obtain short-term profits through the mechanism of late allocation, constituted a

2  breach of their fiduciary duty to the Disfavored Hedge Funds and the Aletheia

3  advisory clients invested in those funds.  The Defendants could have fairly and

4  equitably allocated profitable trades among Aletheia's advisory clients, but instead

5  chose to divert those profits to favored accounts, including Eichler's personal

6  trading accounts and Aletheia's proprietary trading account.

7       47.   Similarly, the Defendants' practice of disproportionately allocating

8  other options trades to the Disfavored Hedge Funds only after determining that the

9  trades had lost money, or had diminished in value at the time of late allocation,

10  likewise constituted a breach of fiduciary duty to the Disfavored Hedge Funds and

11  the Aletheia advisory clients invested in those funds.  The Defendants could have

12  fairly and equitably allocated unprofitable trades among Aletheia's advisory

13  clients, but instead chose to steer losses away from favored accounts, including

14  Eichler's personal trading accounts and Aletheia's proprietary trading account.

15       48.   In addition, the Defendants, acting as investment advisers and in

16  connection with the purchase or sale of a security, committed a series of

17  manipulative or deceptive acts in furtherance of a scheme or artifice to defraud or a

18  course of business that operated as a fraud.  From at least mid-August 2009

19  through November 2011, the Defendants disproportionately allocated a greater

20  share of profitable trades to the Favored Aletheia-Related Accounts (including

21  those held by Eichler himself) and Favored Custom Accounts, and a

22  disproportionately smaller share of those trades to the Disfavored Hedge Funds

23  Account, without any justification consistent with the Defendants' fiduciary duty

24  to the Disfavored Hedge Funds and the Aletheia advisory clients invested in those

25  funds.  This conduct had a deceptive purpose and effect because the cherry-picking

26  scheme directed by the Defendants defrauded the Disfavored Hedge Funds and

27  Aletheia clients invested in the Disfavored Hedge Funds.  The Defendants did not

28

1   disclose the cherry-picking scheme to the Disfavored Hedge Funds or their

2   investors, nor did the Defendants disclose the conflicts of interest that resulted

3   from their cherry-picking of trades for the Eichler Accounts and the Aletheia

4   Proprietary Account.

5        49.    The Defendants acted with scienter in perpetrating the cherry-picking

6   scheme.  Eichler personally made each and every allocation determination for the

7   options trades alleged herein.  Over a 27-month period, Eichler knowingly,

8   recklessly or, in the alternative, negligently allocated thousands of options trades

9   more than one hour after trade execution, or after the options position had closed,

10  in a way that disproportionately benefited the favored accounts and that

11  disproportionately disadvantaged the Disfavored Hedge Funds Account, without

12  any justification consistent with the Defendants' fiduciary duty to the Disfavored

13  Hedge Funds and the Aletheia advisory clients invested in those funds.  Indeed,

14  Eichler himself wrongly profited from these late allocations.  Because virtually all

15  of the "perfect information" trades that Eichler allocated to his personal account

16  realized a profit, there is no doubt that the Defendants:  knowingly or recklessly

17  intended to deceive, manipulate or defraud advisory clients of Aletheia through a

18  device, scheme, or artifice to defraud; or alternatively, negligently engaged in

19  transactions, practices, or courses of business that operated as a fraud or deceit

20  upon the Disfavored Hedge Funds and the Aletheia advisory clients invested in

21  those funds, or transactions, practices, or courses of business that were fraudulent,

22  deceptive, or manipulative with respect to the Disfavored Hedge Funds' investors.

23       **C.    No Procedures Designed To Prevent the Cherry-Picking**

24       50.    During the relevant period, Aletheia issued a June 2009 Code of

25  Conduct and Regulatory Compliance Manual and later, a March 2011 Code of

26  Conduct and Regulatory Compliance Manual (the "Aletheia Manuals").  An

27  overview section in the Aletheia Manuals stated that Aletheia expected that its

28

1   employees "act with honesty, integrity" and "in an ethical manner" when dealing

2   with advisory clients and prospective advisory clients.  The section also stated that

3   Aletheia employees were expected to "adhere to the highest standards with respect

4   to any potential conflicts of interest with client accounts" and that employees

5   should never "enjoy an actual or apparent benefit over the account of any client."

6   The Aletheia Manuals purportedly governed personal securities transactions and

7   trade allocations by Aletheia employees.  Despite this, Aletheia failed to establish

8   effective policies and/or procedures to reasonably prevent and/or detect Eichler's

9   cherry-picking scheme during the relevant period.

10          51.     Aletheia had no polices or procedures to ensure that Eichler allocated

11   options trades at or near the time of trade execution, or that Eichler was not

12   disproportionately allocating profitable options trades to favored accounts of

13   clients or himself, while at the same time disproportionately allocating less

14   profitable or unprofitable options trades to disfavored client accounts.

15          52.     Instead, the Aletheia Manuals' specific policies and procedures for

16   trade allocation only related to:  (1) allocation of investment opportunities among

17   client accounts with similar investment objectives for which Aletheia routinely

18   trades the same security at or about the same time; and (2) allocation of aggregated

19   orders among similar client accounts.  Thus, the rules governing trade allocation at

20   Aletheia only applied to trades for the various Aletheia investment strategies and

21   not to the options trading that Eichler used to perpetrate the cherry-picking scheme.

22   With respect to the options trading alleged herein – frequent buying and selling of

23   various options with trades being generally allocated to only one of the favored or

24   disfavored accounts – Aletheia's policies and procedures for trade allocation had

25   no application.

26          53.     As to personal securities transactions by Aletheia's officers and

27   employees, the Aletheia Manuals exempted, from its limitations on personal

28                                              20

1  securities transactions, trades conducted in fully discretionary investment accounts

2  managed by Aletheia.  The Defendants had full discretionary authority over all of

3  the Favored Aletheia-Related Accounts that benefitted from the cherry-picking

4  scheme, and these accounts were therefore not subject to the Aletheia Manuals'

5  policies and procedures on personal securities transactions.

6       54.    Aletheia failed to adopt or implement policies and procedures

7  reasonably designed to prevent the Defendants' cherry-picking scheme and failed

8  to establish, maintain and enforce a written code of ethics that reflected Aletheia's

9  fiduciary obligations.

10       **D.**    **Aletheia's Failure To Disclose Its Precarious Financial Condition**

11       55.    An investment adviser's precarious financial condition is information

12  that is important to its clients and prospective clients.  In the event of the adviser's

13  insolvency or inability to continue its business, the adviser will not be able to

14  provide an adequate level of service to clients, and there is a substantial risk that

15  the advisers' clients will lose prepaid fees or be forced to incur substantial costs in

16  selecting another adviser.  Consequently, the disclosure that clients and prospective

17  clients receive in the event of an adviser's precarious financial condition is critical

18  to their ability to make an informed decision about whether to continue their

19  relationship with the adviser, or whether to engage the adviser at all.

20       1.    Long-Running Lawsuits "Decimated" Aletheia

21       56.    In February 2010, Aletheia sued a minority shareholder, Proctor

22  Investment Managers, LLC ("Proctor"), in state court, alleging *inter alia* breach of

23  contract (the "*Proctor* lawsuit").  Proctor subsequently cross-claimed.  The matter

24  is currently set for trial on May 6, 2013.  According to Eichler, the demands of

25  discovery and the litigation process in the *Proctor* lawsuit caused Aletheia "to

26  expend countless hours toiling" and "to suffer great losses, including the loss of

27  key employees as well as clients and investors."  On November 2010, another

28

     21

1    Aletheia minority shareholder, Roger Peikin, brought suit against Aletheia for
2    wrongful termination, breach of contract, and other quasi-contractual and tort
3    causes of action (the "*Peikin* lawsuit").  The *Peikin* lawsuit remains pending.
4    According to Eichler, the burdens of discovery and litigation in the *Peikin* lawsuit
5    similarly caused Aletheia "to suffer great losses, including the loss of key
6    employees as well as clients and investors."  According to Eichler, the *Proctor*
7    lawsuit and the *Peikin* lawsuit "severely inhibited" Aletheia's "ability to continue
8    to operate its business profitably" and had "decimated" the firm by summer 2012.

9         57.    In 2011, as the lawsuits continued to proceed in state court, Aletheia's
10   assets under management dropped from approximately $7.24 billion to $4.23
11   billion.  As of the end of September 2012, Aletheia's assets under management had
12   further declined to approximately $1.62 billion.  On November 20, 2012,
13   Aletheia's assets under management had fallen even further to approximately
14   $1.44 billion.

15              2.    Aletheia's Failure to Pay Its California Taxes

16        58.    By September 30, 2011 Aletheia's liabilities exceeded its assets,
17   resulting in negative shareholder equity of approximately $1.96 million.  In Q3
18   2011, Aletheia operated at a net loss of approximately $7.7 million.

19        59.    In 2011, Eichler learned that Aletheia owed the California State
20   Franchise Tax Board a substantial amount of unpaid state income taxes and
21   penalties.  Although Eichler was alerted to Aletheia's state tax liabilities and
22   deficiencies no later than 2011, Aletheia had not resolved that debt as of July 2012.

23        60.    On July 2, 2012, the state of California accordingly filed a
24   $2,053,470.13 tax lien against Aletheia for income taxes owed from tax year 2008,
25   and penalties for late-filed returns in tax years 2010, 2011 and 2012.

26        61.    Over the next several months, Aletheia was unable to resolve the
27   outstanding lien, and on October 1, 2012, California suspended Aletheia's

28                                        22

1    corporate status for non-payment of taxes pursuant to section 23301 of the

2    California Revenue and Tax Code.  The purpose of section 23301 is to prohibit a

3    delinquent corporation from enjoying the ordinary privileges of a going concern.

4         62.    Under California law, as a suspended corporation, Aletheia could not,

5    and cannot legally exercise any of its corporate powers, rights and privileges.  It

6    also could not, and cannot prosecute or defend a lawsuit.  In addition, Aletheia

7    could not and cannot appeal from an adverse judgment, seek a writ of mandate, or

8    renew a judgment that it obtained before its suspension.  Any contract entered into

9    by Aletheia during its suspension is voidable at the option of the suspended

10   company's counter-party.

11        63.    Once suspended, Aletheia could not lawfully engage in the securities

12   (or any other) business.

13               3.    Aletheia's Bankruptcy

14        64.    By the end of September 2012, Aletheia's balance sheet reported

15   negative shareholder equity of approximately $4.3 million.  In Q3 2012, Aletheia

16   operated at a net loss of approximately $2.7 million.

17        65.    On November 11, 2012, Aletheia filed for Chapter 11 bankruptcy

18   protection in the United States Bankruptcy Court for the Central District of

19   California.  At that time, Aletheia listed those creditors holding the 20 largest

20   unsecured claims against Aletheia.  In addition to the unpaid taxes and penalties it

21   owed the California Franchise Tax Board, Aletheia owed approximately $647,000

22   to various business creditors.  Aletheia also owed about $6 million to other third-

23   parties.  Finally, Aletheia owed approximately $2.9 million to various law and

24   financial consulting firms, $2 million of which was disputed.

25        66.    As of November 17, 2012, the total funds in Aletheia's bank accounts

26   had dwindled to $311,340.09.

27

28

4.      Aletheia's False Form ADV

67.     As a registered investment adviser, Aletheia was required to file a Form ADV with the Commission. The Form ADV contains certain required disclosures concerning the investment adviser and is available for review by the general public.

68.     Specifically, Form ADV, Part 1, Item 3.A. required Aletheia to describe its form of organization and Form ADV, Part 1, Item 11.D.(5) required Aletheia to state whether any state regulatory agency has ever denied, suspended, or revoked its registration or license, or otherwise restricted its activities.

69.     Beginning in 2011, Part 2 of Form ADV further required investment advisers to prepare narrative brochures in plain English. The brochure is the primary disclosure document that investment advisers must provide to their clients. Form ADV, Part 2A, Item 18.B. required Aletheia to disclose in its brochure any financial condition that is reasonably likely to impair Aletheia's ability to meet contractual commitments to its clients.

70.     Aletheia filed a Form ADV with the Commission on September 14, 2012. In Aletheia's September 14, 2012 Form ADV Part 2A brochure, Aletheia stated, "Not Applicable," in response to Item 18, which required Aletheia to disclose any financial condition that is reasonably likely to impair Aletheia's ability to meet contractual commitments to its clients.

71.     In its September 14, 2012 Form ADV Part 2A brochure:

A.      Aletheia did not state that the *Proctor* litigation and the *Peikin* litigation had "severely inhibited" Aletheia's "ability to continue to operate its business profitably" and had "decimated" the firm;

B.      Aletheia did not state that on July 2, 2012, California had filed a $2,053,470.13 lien against Aletheia for non-payment of 2008 taxes and for penalties arising from the 2010, 2011, and 2012 tax years; and

24

C.     Aletheia did not state that if left unpaid, the tax lien would result in the suspension of Aletheia's corporate status, thereby cutting off Aletheia's ability to lawfully operate as a going corporate concern.

72.     Aletheia's September 14, 2012 Form ADV failed to disclose multiple financial conditions that were reasonably likely to impair Aletheia's ability to meet its contractual commitments to its advisory clients. Accordingly, Aletheia willfully omitted to state in its September 14, 2012 Form ADV material facts that were required to be stated therein.

73.     Aletheia filed another Form ADV with the Commission on September 24, 2012. In Part 1, Item 3.A. of its September 24, 2012 Form ADV, Aletheia stated that it was a corporation. In Part 1, Item 11.D.(5) of its September 24, 2012 Form ADV, Aletheia stated that no state regulatory agency had ever suspended or revoked its registration or license, and that no state regulatory agency had ever restricted its activities.

74.     One week later, on October 1, 2012, the state of California suspended Aletheia's corporate status. Once suspended, Aletheia was legally powerless to conduct its investment advisory business (or any other business).

75.     Although it lost its right to lawfully engage in its investment advisory business on October 1, 2012, Aletheia did not amend its false September 24, 2012 Form ADV until November 9, 2012. At that time, several weeks after its corporate suspension, Aletheia finally filed an amended Form ADV disclosing the California tax lien and the revocation of its corporate status.

76.     Aletheia's November 9, 2012 Form ADV, Part 2A brochure further stated that Aletheia intended to file for bankruptcy to protect itself from costly litigation, to raise additional capital, and to assist in the resolution of Aletheia's tax and corporate status issues. But Aletheia's November 9, 2012 Form ADV did not, however, provide a complete account of Aletheia's precarious financial condition.

25

1  For example, the November 9, 2012 Form ADV failed to disclose that Aletheia
2  was behind in its payments to its business creditors.

3        77.    Having not disclosed its corporate suspension until several weeks
4  after the fact, Aletheia failed to promptly amend its Form ADV to update material
5  information concerning its corporate status and financial condition.

6                         **FIRST CLAIM FOR RELIEF**
7                  Anti-Fraud Provisions of the Exchange Act
8              **Violations of Section 10(b) of the Exchange Act**
9           **and Rule 10b-5(a) & (c) Thereunder By All Defendants**

10       78.    The Commission realleges and incorporates by reference paragraphs 1
11  through 49 above as if set forth fully herein.

12       79.    The Defendants, by engaging in the conduct described above, directly
13  or indirectly, singularly or in concert, in connection with the purchase or sale of
14  securities, by the use of the means or instrumentalities of interstate commerce or of
15  the mails, knowingly or recklessly:  employed devices, schemes, or artifices to
16  defraud; or engaged in acts, practices, or courses of business which operated or
17  would operate as a fraud or deceit upon certain other persons, including advisory
18  clients of Aletheia.

19       80.    By engaging in the conduct described above, the Defendants violated,
20  and unless enjoined, will continue to violate Section 10(b) of the Exchange Act, 15
21  U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5(a) & (c).

22                        **SECOND CLAIM FOR RELIEF**
23                  **Anti-Fraud Provisions of the Advisers Act**
24  **Violations of Sections 206(1) and 206(2) of the Advisers Act By All Defendants**

25       81.    The Commission realleges and incorporates by reference paragraphs 1
26  through 49 above as if set forth fully herein.

27       82.    Aletheia at all relevant times was an investment adviser as defined by

28

                                    26

1    Section 202(a)(11) of the Adviser's Act, 15 U.S.C. § 80b-2(a)(11).

2         83.    Eichler at all relevant times was an investment adviser as defined by

3    Section 202(a)(11) of the Advisers Act, 15 U.S.C. §80b-2(a)(11), because as

4    founder, majority owner, chairman, CEO, and CIO of Aletheia, Eichler controlled

5    Aletheia and provided investment advice to its advisory clients.

6         84.    The Defendants, directly or indirectly, singularly or in concert, by the

7    use of the means or instrumentalities of interstate commerce or of the mails, while

8    acting as investment advisers, knowingly or recklessly employed devices, schemes

9    or artifices to defraud; or knowingly, recklessly or negligently engaged in acts,

10   transactions, practices and courses of business which operated or would operate as

11   a fraud or deceit upon certain other persons, including advisory clients of Aletheia.

12        85.    By engaging in the conduct described above, the Defendants violated,

13   and unless enjoined, will continue to violate Sections 206(1) and 206(2) of the

14   Advisers Act, 15 U.S.C. § 80b-6(1) and (2).

### THIRD CLAIM FOR RELIEF

#### Anti-Fraud Provision of the Advisers Act

#### Violation of Section 206(4) of the Advisers Act

#### and Rule 206(4)-8(a) Thereunder By All Defendants

19        86.    The Commission realleges and incorporates by reference paragraphs 1

20   through 49 above as if set forth fully herein.

21        87.    The Defendants directly or indirectly, singularly or in concert, by the

22   use of the means or instrumentalities of interstate commerce or of the mails, while

23   acting as investment advisers, knowingly, reckless or negligently:  engaged in acts,

24   practices and courses of business that are fraudulent, deceptive, or manipulative

25   with respect to any investor in the Disfavored Hedge Funds.

26        88.    By engaging in the conduct described above, the Defendants violated,

27   and unless enjoined, will continue to violate Section 206(4) of the Advisers Act, 15

28

27

U.S.C. § 80b-6(4), and Rule 206(4)-8(a) thereunder, 17 C.F.R. § 275.206(4)-8(a).

## FOURTH CLAIM FOR RELIEF

### Compliance Procedures and Practices Provision of the Advisers Act

### Violation of Section 206(4) of the Advisers Act

### and Rule 206(4)-7 Thereunder By Defendant Aletheia

89.     The Commission realleges and incorporates by reference paragraphs 1 through 54 above as if fully set forth herein.

90.     Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), and Rule 206(4)-7(a) promulgated thereunder, 17 C.F.R. § 275.206(4)-7, prohibit registered investment advisers from providing investment advice to clients unless they have adopted and implemented written policies and procedures reasonably designed to prevent violations by the investment advisers and its employees of the Advisers Act and rules thereunder.

91.     Aletheia, by engaging in the conduct described above, acting as an investment adviser, directly or indirectly, knowingly, recklessly or negligently failed to adopt or implement policies and procedures reasonably designed to prevent Eichler's cherry-picking scheme.

92.     By engaging in the conduct described above, Aletheia has violated, and unless enjoined, will continue to violate the provisions of Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), and Rule 206(4)-7(a) promulgated thereunder, 17 C.F.R. § 275.206(4)-7.

## FIFTH CLAIM FOR RELIEF

### Failure To Establish, Maintain, and Enforce a Written Code of Ethics

### Reflecting Aletheia's Fiduciary Obligations

### Violation of Section 204A of the Advisers Act

### and Rule 204A-1(a) Thereunder By Defendant Aletheia

93.     The Commission realleges and incorporates by reference paragraphs 1

28

1  through 54 above as if set forth fully herein.

2        94.    Rule 204A-1(a), promulgated under Section 204A of the Advisers

3  Act, requires an investment adviser to establish, maintain, and enforce a written

4  code of ethics that reflects Aletheia's fiduciary obligations to its advisory clients

5  and that requires Eichler, among others, to comply with all applicable federal

6  securities laws and rules promulgated thereunder.

7        95.    Aletheia, by engaging in the conduct described above, acting as an

8  investment adviser, failed to establish, maintain, and enforce a written code of

9  ethics that would have prevented Eichler's cherry-picking scheme by requiring him

10  to comply with all applicable federal securities laws and rules promulgated

11  thereunder.

12        96.    By engaging in the conduct described above, Aletheia has violated,

13  and unless enjoined, will continue to violate Section 204A of the Advisers Act, 15

14  U.S.C. § 80b-4A, and Rule 204A-1(a) thereunder, 17 C.F.R. § 204A-1(a).

15  **SIXTH CLAIM FOR RELIEF**

16  **Untrue Statements or Omissions of Material Fact in Form ADV**

17  **Violation of Sections 204 and 207 of the Advisers Act**

18  **and Rule 204-1(a)(2) Thereunder By Defendant Aletheia**

19        97.    The Commission realleges and incorporates by reference paragraphs 1

20  through 20, paragraph 45, and paragraphs 55 through 77 above as if fully set forth

21  herein.

22        98.    Section 207 of the Advisers Act, 15 U.S.C. § 80b-7, makes it unlawful

23  for any person to make any untrue statement of material fact in any report filed

24  with the Commission under Section 204 of the Advisers Act, 15 U.S.C. § 80b-4, or

25  to willfully omit to state in such reports material facts which are required to be

26  stated therein.

27        99.    Aletheia, by engaging in the conduct described above, directly or

28

29

1    indirectly, willfully made untrue statements of material fact in reports filed with

2    the Commission under Section 204 of the Advisers Act, 15 U.S.C. § 80b-4, or

3    willfully omitted to state in such reports material facts which are required to be

4    stated therein.

5        100.   By engaging in the conduct described above, Aletheia has violated,

6    and unless enjoined, will continue to violate the provisions of Section 207 of the

7    Advisers Act, 15 U.S.C. § 80b-7.

8                        **SEVENTH CLAIM FOR RELIEF**

9                 **Failure to Promptly Amend Form ADV**

10            **Violation of Section 204 of the Advisers Act**

11        **and Rule 204-1(a)(2) Thereunder By Defendant Aletheia**

12        101.   The Commission realleges and incorporates by reference paragraphs 1

13    through 20, paragraph 45, and paragraphs 55 through 77 above as if set forth fully

14    herein.

15        102.   Rule 204-1(a)(2), promulgated under Section 204 of the Advisers Act,

16    requires an investment adviser to amend its Form ADV whenever required by the

17    instructions to Form ADV.  General Instruction 4 to the Form ADV provides that

18    an investment adviser must amend its Form ADV promptly if information

19    previously provided in a Form ADV concerning the investment adviser's form of

20    organization or financial condition becomes inaccurate in any way.

21        103.   Aletheia failed to promptly file an amendment on Form ADV, 17

22    C.F.R. § 279.1, updating information concerning its suspended corporate status and

23    precarious financial condition.

24        104.   By engaging in the conduct described above, Aletheia has violated,

25    and unless enjoined, will continue to violate Section 204 of the Advisers Act, 15

26    U.S.C. § 80b-4, and Rule 204-1(a)(2) thereunder, 17 C.F.R. § 275.204-1(a)(2).

27

28

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Enter a permanent injunction restraining Aletheia and each of its agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, from directly or indirectly engaging in violations of:

1. Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5;

2. Sections 206(1), 206(2) and 206(4) of the Advisers Act, 15 U.S.C. 80b-6(1), (2) and (4), and Rules 206(4)-7(a) and 206(4)-8(a) thereunder, 17 C.F.R. §§ 275.206(4)-7(a) and 275.206(4)-8(a);

3. Section 207 of the Advisers Act, 15 U.S.C. 80b-7, and Rule 204-1(a)(2) thereunder, 17 C.F.R. § 275.204-1(a)(2); and

4. Section 204A of the Advisers Act, 15 U.S.C. § 80b-4A, and Rule 204A-1(a) thereunder, 17 C.F.R. § 275.204A-1(a).

### II.

Order Aletheia to disgorge any and all ill-gotten gains obtained, and any and all losses avoided, through Defendants' cherry-picking scheme and other misconduct, together with prejudgment interest thereon;

### III.

Order Aletheia to pay appropriate civil monetary penalties under Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), and Section 209(e) of the Advisers Act, 15 U.S.C. § 80b-9(e);

### IV.

Enter a permanent injunction restraining Eichler and each of his agents, servants, employees and attorneys, and those persons in active concert or

31

1 | participation with any of them, who receive actual notice of the judgment by

2 | personal service or otherwise, from directly or indirectly engaging in violations of:

3 |    1.   Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5

4 |         thereunder, 17 C.F.R. § 240.10b-5; and

5 |    2.   Sections 206(1), 206(2) and 206(4) of the Advisers Act, 15 U.S.C. 80b-

6 |         6(1), (2) and (4), and Rule 206(4)-8(a) thereunder, 17 C.F.R. §

7 |         275.206(4)-8(a);

8 | **V.**

9 |    Order Eichler to disgorge any and all ill-gotten gains obtained, and any and

10 | all losses avoided, through Defendants' cherry-picking scheme and other

11 | misconduct, together with prejudgment interest thereon;

12 | **VI.**

13 |    Order Eichler to pay appropriate civil monetary penalties under Section

14 | 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), and Section 209(e) of the

15 | Advisers Act, 15 U.S.C. § 80b-9(e);

16 | **VII.**

17 |    Retain jurisdiction of this action in accordance with the principles of equity

18 | and the Federal Rules of Civil Procedure in order to implement and carry out the

19 | terms of all orders and decrees that may be entered, or to entertain any suitable

20 | application or motion for additional relief within the jurisdiction of this Court; and

21 | **VIII.**

22 |    Grant such other and further relief as this Court may determine to be just and

23 | necessary.

24

25

26

27

28

32

1   DATED:  December 14, 2012

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOHN B. BULGOZDY
GARY Y. LEUNG
JANET E. MOSER
Attorneys for Plaintiff
Securities and Exchange Commission

33

## APPENDIX A

| Favored Custom Accounts | Favored Aletheia-Related Accounts | Disfavored Hedge Funds Account |
|---|---|---|
| XXX-XX0128 | XXX-XX0001 | XXX-XX3280 |
| XXX-XX 1343 | XXX-XX 0400 | |
| XXX-XX 3425 | XXX-XX 0524 | |
| XXX-XX 1335 | XXX-XX 1007 | |
| XXX-XX 1150 | XXX-XX 0419 | |
| XXX-XX 1279 | XXX-XX 0494 | |
| XXX-XX 0957 | XXX-XX 0577 | |
| XXX-XX 1564 | XXX-XX 0350 | |
| XXX-XX 0663 | XXX-XX 1360 | |
| XXX-XX 0142 | XXX-XX 0206 | |
| XXX-XX 3409 | XXX-XX 0712 | |
| XXX-XX 3182 | XXX-XX 1378 | |
| XXX-XX 2316 | XXX-XX 0435 | |
| XXX-XX 1106 | XXX-XX 0443 | |
| XXX-XX 0975 | XXX-XX 0575 | |
| XXX-XX 2763 | XXX-XX 0214 | |
| XXX-XX 0498 | XXX-XX 0311 | |
| XXX-XX 1297 | XXX-XX 0194 | |
| XXX-XX 0134 | XXX-XX 0036 | |
| XXX-XX 1467 | XXX-XX 0540 | |
| XXX-XX 1246 | XXX-XX 0559 | |
| XXX-XX 0728 | XXX-XX 0399 | |
| XXX-XX 1432 | XXX-XX 0631 | |
| XXX-XX 1386 | XXX-XX 0640 | |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge John F. Walter and the assigned discovery Magistrate Judge is Ralph Zarefsky.

The case number on all documents filed with the Court should read as follows:

## CV12- 10692 JFW (RZx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

**Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

**Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

**Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)    NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

John B. Bulgozdy, Cal. Bar No. 219897
Email: bulgozdyj@sec.gov
Gary Y. Leung, L.R. 83-2.4.1 leave to practice granted
Email: leungg@sec.gov
Janet E. Moser, Cal. Bar No. 199171
Email: moserj@sec.gov
Securities and Exchange Commission
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
Telephone: (323) 965-3998 / Facsimile: (323) 965-3908

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| SECURITIES AND EXCHANGE COMMISSION | CASE NUMBER |
|---|---|
| PLAINTIFF(S) | CV12-10692 JFW(PZx) |
| v. | |
| ALETHEIA RESEARCH AND MANAGEMENT, INC., and PETER J. EICHLER, JR. | **SUMMONS** |
| DEFENDANT(S). | |

TO:   DEFENDANT(S): _____

_____

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, John B. Bulgozdy, Gary Y. Leung, Janet E. Moser whose address is SEC, 5670 Wilshire Boulevard, 11th Floor, Los Angeles, CA 90036 _____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

DEC 1 4 2012

Dated: _____

Clerk, U.S. District Court

By: _____
Deputy Clerk

(Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

John B. Bulgozdy, Cal. Bar No. 219897
Email: bulgozdyj@sec.gov
Gary Y. Leung, L.R. 83-2.4.1 leave to practice granted
Email: leungg@sec.gov
Janet E. Moser, Cal. Bar No. 199171
Email: moserj@sec.gov
Securities and Exchange Commission
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
Telephone: (323) 965-3998 / Facsimile: (323) 965-3908

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION | CASE NUMBER |
| PLAINTIFF(S) | **CV12-10692** TFW (P2x) |
| v. | |
| ALETHEIA RESEARCH AND MANAGEMENT, INC., and PETER J. EICHLER, JR. | **SUMMONS** |
| DEFENDANT(S). | |

TO:    DEFENDANT(S): _____

_____

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, John B. Bulgozdy, Gary Y. Leung, Janet E. Moser whose address is SEC, 5670 Wilshire Boulevard, 11th Floor, Los Angeles, CA 90036 _____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

DEC 1 4 2012

Clerk, U.S. District Court

Dated: _____

By: _____  JULIE PRADO

Deputy Clerk

(Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
SECURITIES AND EXCHANGE COMMISSION

**DEFENDANTS**
ALETHEIA RESEARCH AND MANAGMENT, INC., AND PETER J. EICHLER, JR.

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

John B. Bulgozdy, Gary Y. Leung, Janet E. Moser   (323) 965-3998
Securities and Exchange Commission
5670 Wilshire Boulevard, 11th Floor, Los Angeles, CA 90036

Attorneys (If Known)

Robert A. Robertson   (949) 442-6000
Dechert LLP
2010 Main Street, Suite 500, Irvine, CA 92614

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☑ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question (U.S. Government Not a Party)

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☐ Yes  ☑ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes  ☑ No          ☐ MONEY DEMANDED IN COMPLAINT: $_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
The Complaint alleges violations of the federal securities laws. 15.U.S.C. § 78j(b); 15 U.S.C. §80b-6; 15 U.S.C. § 80b-7; 15 U.S.C. § 80b-4A

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☑ 850 Securities/Commodities/ Exchange | | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | REAL PROPERTY | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 210 Land Condemnation | | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 220 Foreclosure | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 230 Rent Lease & Ejectment | IMMIGRATION | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | ☐ 245 Tort Product Liability | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 245 Tort Product Liability | ☐ 290 All Other Real Property | ☐ 465 Other Immigration Actions | | |
| | ☐ 290 All Other Real Property | | | | |

# CV12-10692

**FOR OFFICE USE ONLY:**   Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a).  IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☑ No   ☐ Yes
If yes, list case number(s): _____

**VIII(b).  RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☑ No   ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)   ☐ A.  Arise from the same or closely related transactions, happenings, or events; or
                               ☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
                               ☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
                               ☐ D.  Involve the same patent, trademark or copyright, <u>and</u> one of the factors identified above in a, b or c also is present.

**IX. VENUE:**  (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☑   Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  |  |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Defendant Aletheia Research and Management, Inc. - Los Angeles County<br>Defendant Peter J. Eichler, Jr. - Los Angeles County |  |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
     **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles |  |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved.

X.  SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date December 14, 2012

**Notice to Counsel/Parties:**  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |